UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MIQUIELINE A. RAIFORD | * | CIVIL ACTION NO. 22-764 |
| | * | |
| VERSUS | * | SECTION: "E"(1) |
| | * | |
| KILOLO KIJAKAZI, ACTING | * | JUDGE SUSIE MORGAN |
| COMMISSIONER OF THE SOCIAL | * | |
| SECURITY ADMINISTRATION | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

REPORT AND RECOMMENDATION

The plaintiff, Miquieline A. Raiford, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Act, 42 U.S.C. §§ 423, 1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 7) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 9) be GRANTED.

**Procedural Background**

Ms. Raiford applied for SSI and DIB on April 24, 2019, asserting a disability onset date of September 13, 2016. She alleged the following illnesses, injuries, or conditions: blind or low vision, anxiety and depression, degenerated neck, degenerated back, problems with right arm, and problems with right hip. She was represented by counsel. The state agency denied her claim on February 13, 2020. Upon reconsideration and Ms. Raiford's submission of additional medical records, the state agency denied her claim on September 28, 2020.

Ms. Raiford requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 27, 2021.[1] On June 30, 2021, the ALJ issued an adverse decision. Ms. Raiford timely appealed to the Appeals Council, which denied review on January 21, 2022.

On March 24, 2022, Ms. Raiford filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 5, 6). The parties filed cross-motions for summary judgment. (Rec. Docs. 7, 9). Ms. Raiford remains represented by counsel.

## Evidence in the Record

*Hearing Testimony*

Ms. Raiford was 54 years old at the time of the hearing before the ALJ on April 27, 2021. R. at 39.

Ms. Raiford has a high school education. R. at 39. From 2006 to 2013, she worked with patients as an orthodontic assistant. Id. She was involved in a motor vehicle accident in 2015 and again in 2019. R. at 41.

Ms. Raiford complained of neck and back pain. R. at 40. She reported that she gets tingles from her neck into her arm. Id. She reported that she drops things and is not able to hold onto things with her dominant hand. Id. She says this occurs several times a day. R. at 46. On a pain scale of one to ten, she characterized her neck pain as a ten. R. at 40. She has had physical therapy, they have burned the nerves in her neck twice, and she has taken Cymbalta. Id. She reported that the medicine does not help. R. at 41. She also reported that her physicians are looking to do surgery in the future. Id.

---

[1] The hearing was held by phone with the consent of all parties due to the COVID-19 pandemic.

Ms. Raiford also suffers from seizures. She reported that her last seizure was in 2019. R. at 43. She continues to take Keppra for seizures. Id. She conceded that her seizures are not as bad since her dosage increased, but she reported that Keppra causes her to zone out. Id

Ms. Raiford reported that as a result of her depression and anxiety, she isolates herself, her heart races, and she has constant meltdowns. Id. She reported experiencing these symptoms almost every day. Id. She had to stop taking Abilify because it irritated the ulcers in her stomach. R. at 44. She also reported suffering from panic attacks. R. at 48. She gets the shakes, she sweats, she cries, and she trembles. R. at 48. She had a panic attack the morning before the hearing. R. at 48-49.

Ms. Raiford reported that her vision is horrible. R. at 47. She said that even with corrective lenses, she still has issues. Id. She had just gone to the eye doctor and they had changed her prescription. R. at 48. But she reported she did not notice much improvement. Id. She reported she had discussed surgery with her doctor, but she cannot get surgery because of the insurance. Id.

Ms. Raiford reported that she cannot lift and carry more than five pounds, that she can only stand for about five minutes, and that she can only sit for about five minutes before having to get up or move around. R. at 44. She reported that she can walk about ten feet. Id. She reported that she cannot stay on track or remember things. Id. She loses concentration. Id. She also reported that she does not get along with others. R. at 45. She gets very agitated and emotional when she thinks people do not understand her. Id.

Ms. Raiford washes clothes using the washing machine. R. at 45. Sweeping and mopping hurt her back. Id. She does not drive, and someone else does the grocery shopping for her. Id. She does not need assistance with personal hygiene, getting dressed, showering, or going to the bathroom. R. at 46. She reported that she has to lay down to relieve the pain in her back for fifteen

to twenty minutes about two or three times a day. R. at 46. The pain also wakes her when she tries to sleep at night. Id.

Vocational expert John Yent testified at the hearing. He reported that there was no Dictionary of Occupational Titles ("DOT") title for orthodontic assistant. He identified the closest match as dental assistant, light work with an SVP of 6. He also identified Ms. Raiford's prior work as a pharmacy clerk, light work with an SVP of 3, and a pricing clerk, light with an SVP of 2. R. at 50.

The ALJ asked the vocational expert to consider a hypothetical individual with the same age, education, and work experience as Ms. Raiford who can lift 20 pounds occasionally and ten pounds frequently; stand and walk a total of six hours in an eight-hour work day; sit six hours in an eight-hour work day; occasionally balance, stoop, kneel, crouch, and crawl; never climb ramps, stairs, ladders, ropes, or scaffolds; and occasionally reach overhead and frequently in other directions. The person can have no exposure to hazards, including dangerous moving machinery and unprotected heights, operation of motor vehicles and open bodies of water. The person is limited to simple, routine, repetitive tasks of unskilled work; can maintain attention and concentration for no longer than two-hour blocks of time; and is limited to a low-stress environment, defined as no fast-paced production requirements or simple work related decisions with few or no changes in work setting. R. at 50-51.

The vocational expert testified that such an individual could perform Ms. Raiford's past work as a price marker, DOT 209.587-034, light, unskilled, with an SVP of 2 and an estimated 463,720 jobs in the national economy. R. at 51. Additionally, he testified that such a person could perform work as a housekeeping cleaner, DOT Code 323.687-014, light, unskilled, with an SVP of 2, and with 223,355 positions in the national economy; as well as a dispatcher router, DOT code

4

222.587-038, light, unskilled, with an SVP of 2, and with an estimated 75,807 jobs in the national economy. R. at 51-52. He reported that if the individual needed a ten minute break every hour, that would exceed what employers were willing to do. R. at 52.

The ALJ asked how the vocational expert could provide testimony about any factors in the hypothetical that are not addressed by the DOT. R. at 52. The vocational expert explained that these opinions are based on his ongoing experience of over 30 years in placing individuals who have disabling conditions in various types of employment. Id.

Ms. Raiford's attorney asked whether the hypothetical individual would be able to perform any work if she needed to lie down for 15-20 minutes two to three times a day in addition to regular breaks. R. at 52. The vocational expert reported that no competitive employment position would accommodate such an individual who also had the profile outlined in the hypothetical. R. at 53.

Ms. Raiford's attorney reported that there was no other medical evidence. R. at 53.

Following the hearing, the vocational expert responded to written interrogatories citing his opinion at the hearing and asking about an additional limitation of avoiding moderate exposure (no more than occasional) to vibrations. R. at 345-46. The expert opined that such an individual could still perform all three previously listed jobs. R. at 346.

*Subjective Reports*

As part of her application for benefits, Ms. Raiford completed a Function Report. She reported that she wakes up at night with hip and neck pain. R. at 248. She reported her conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, remember things, complete tasks, and concentrate. R. at 252. She reported using a cane and glasses. R. at 253.

Her hobbies include watching TV and sewing. R. at 251. She does these daily. Id. She needs extra help to see since her head trauma. Id. She prepares her own meals, sometimes daily. R. at 249. She does laundry and tries to sweep and mop but her hip bothers her. R. at 249. She does not need help to perform these tasks. Id.

She does not drive because she blacked out behind the wheel. R. at 250. If she goes out, she walks or her mother picks her up. R. at 250. She goes shopping for groceries. R. at 250.

She is great at following written instructions and good at following spoken instructions. R. at 252. She gets along great with authority figures. R. at 253. But she does not handle stress well, especially after the floods. R. at 253. She also does not handle changes in routine well. Id. She noted that she lost a brother and has never been the same. Id.

Ms. Raiford completed a seizure questionnaire. R. at 280. She reported suffering a seizure about every six months, with her first seizure in May 2016. R. at 280. She reported seizures in November 2018, February 2019, and May 2019. R. at 280. She reported feeling confused, tired, drained, and shaky after a seizure. Id. She is able to resume normal activities after two to three days. Id. She is terrified of driving and afraid of being alone. R. at 282.

Ms. Raiford's mother also completed a seizure questionnaire. R. at 275. She has not seen a seizure but has seen Ms. Raiford immediately after. Id. Ms. Raiford was confused with a blank look in her eyes. Id. She did not recognize anyone or remember who the president was. R. at 275, 277. It takes her two weeks to remember and put things together again. R. at 277. Ms. Raiford's mother also reported that Ms. Raiford has suffered head injuries during seizures. R. at 277.

*Medical Records*[2]

Ms. Raiford began treating at the Advanced Spine Institute following a motor vehicle accident in March 2015. R. at 589. She presented for an MRI of the cervical spine on May 5, 2015. R. at 579. Disc narrowing and anterior osteophyte formation at C4-5 and C5-6 and1mm posterior disc bulge at C4-5, C5-6, and C6-7 were noted. Id.  An MRI of the lumbar spine revealed mild facet arthropathy mildly narrows the neural foramina without expected nerve root compression at L4-5 and L5-S1. Id.

Ms. Raiford presented to Dr. Graham with complaints of right sided neck and right upper extremity pain on July 27, 2015. R. at 403. She reported that the pain began about 4 months earlier after a motor vehicle accident. Id.  She reported significant right-sided occipital headaches. Id. She also reported that physical therapy seemed to exacerbate the pain. Id.  She complained of difficulty driving due to pain and not sleeping well due to pain. R. at 403. She rated her pain at a level of 6 out of 10. R. at 560. On a review of systems, she was positive for back pain, neck pain, decreased range of motion, joint pain, muscle cramps, muscle weakness, headaches, no decreased memory, anxiety, depression, easily irritated. R. at 560-61. Upon physical examination, her gait and station were normal and she had an appropriate fund of knowledge, no impairment of memory, appropriate judgment and insight, and her attention span and ability to concentrate were normal. R. at 561. She had normal muscle strength in upper and lower extremities. Id.  However, it was

---

[2] Ms. Raiford filed an earlier application for DIB and SSI that was denied on March 22, 2019. That decision was not appealed, and therefore Ms. Raiford's non-disability through March 23, 2019, is established as matter of res judicata. Gibson v. Sec'y of Health, Educ. & Welfare, 678 F.2d 653, 654 (6th Cir. 1982). To prevail on the application for benefits now under review, Ms. Raiford must establish a disability beginning on March 23, 2019. As a result, the relevant period begins on March 23, 2019, and the court's summary of the medical records focuses on this time period. The court acknowledges that earlier medical evidence may, nonetheless, be relevant, and has summarized earlier evidence to reflect that identified by Ms. Raiford and that which the Court finds relevant here. See Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Groves v. Apfel, 148 F.3d 809, 810 (7th Cir. 1998); DeBoard v. Comm'r of Soc. Sec., 211 F. App'x 411, 414 (6th Cir. 2006).

noted she experienced painful extension maneuvers and tenderness on palpation on examination of cervical range of motion. Id.

Ms. Raiford received a Cervical Dorsal Medial Branch Block Right C4-5 and C5-6 on August 12, 2015. R. at 558. Following the procedure, she reported pain of 0 out of 10. R. at 559. She followed up on August 24, 2015, and reported 70% relief (immediate and sustained). R. at 403. Her pain was 3 out of 10. R. at 555. Upon a review of systems, she was positive for back pain, neck pain, decreased range of motion, joint pain, muscle cramps and muscle weakness, headaches, anxiety, depression, and easily irritated. R. at 556. Upon physical examination, she had normal muscle strength, but she experienced painful extension maneuvers and tenderness of the cervical spine. R. at 556.

She followed up with Dr. Graham on September 14, 2015, and reported pain of 3 out of 10. R. at 552. She was positive for back pain, neck pain, decreased range of motion, joint pain, muscle cramps, and muscle weakness, headaches, anxiety, depression, easily irritated. R. at 553. Upon physical examination, she continued to experience painful extension maneuvers and tenderness of the cervical spine. Id. It was noted that her status post DMBB was 70% immediate and sustained relief, but her pain was starting to return. R. at 554. Dr. Sean Graham noted that when pain becomes intolerable, they would move forward with radiofrequency ablation at C4-5 and C5-6 and ordered Ms. Raiford to follow up with Dr. Ioppolo. Id.

On October 15, 2015, Dr. Ioppolo noted that the CDMBB had helped a lot. R. at 577.

Ms. Raiford followed up with Dr. Graham on November 23, 2022. R. at 403. She reported throbbing pain at 7 out of 10 and was ready to start radiofrequency ablation. Id. She denied numbness or tingling. Id. It was noted that her pain was clinically consistent with cervical

spondylosis with radiculitis. R. at 551. She was started on Neurontin and ordered to follow up with Dr. Ioppolo. Id.

On January 6, 2016, she reported to Dr. Ioppolo that the cervical radiofrequency lesion performed in December had helped quite a bit. R. at 572. She still had back pain and on examination, she had pain on palpation over the facets and pain on extension of the back. Id. Her Norco prescription was reduced from three to two times per day. Id. Dr. Ioppolo noted that he would ask Dr. Turnipseed to do a medial branch block and radiofrequency lesion. Id. Facet arthropathy at L4 and L5 on her MRI scan were noted. Id.

She returned to see Dr. Gaudin on June 28, 2016, for a refill of Klonopin. R. at 669. She was still on Lexapro and reported the medication was helping. Id. On a review of systems, she reported no depression or sleep disturbances. Id. On physical examination, her gait and stance were normal. R. at 670.

She followed up with Dr. Graham on August 29, 2016, with complaints of neck and back pain. R. at 403. Her pain level was 10 of 10 and described as an ache that radiated to her right arm. Id. She denied side effects from Neurontin, and noted that it helped more than Norco. Id. She reported pain on her right side started recently after she ran out of Neurontin. Id. She denied symptoms distal to right elbow. Id. She reported she experienced 60-70% relief for five months following her December 2015 radiofrequency ablation. Id. On a review of symptoms, she was positive for back pain, decreased range of motion, joint pain, muscle cramps, muscle weakness, and neck pain. R. at 404. She had no knee or shoulder pain. Id. On examination, her gait and station were normal. Id. She was alert and oriented, had no impairment of memory, was able to name objects and repeat phrases, and had an appropriate fund of knowledge, normal concentration, and appropriate judgment and insight. Id. She experienced painful extension maneuvers in her

cervical spine, but she was able to flex without pain. Id. Painful rotation maneuvers, pain with lateral bending, paraspinous tenderness, facet tenderness, occipital, trapezius, and interscapular tenderness were noted. Id. She was negative for Spurling's sign and Hoffman's sign. Id. Her lumbar spine had no pain with extension, rotation, or flexion. Id. She had no paraspinous tenderness or spasms on lumbosacral palpation. Id.

She presented at the emergency room on September 11, 2016, complaining of severe stress. R. at 716. Her boyfriend stated that she had been crying and stressing out during breakfast and then stared and would not answer for 10 minutes, then she resumed normal behavior. Id. She said she felt very overwhelmed. Id. She was diagnosed with anxiety reaction. Id.

On September 12, 2016, she reported a problem with anxiety to Dr. Gaudin. R. at 666. She reported being under increased stress from home damages from floods that year. Id. Abnormal ataxia was noted. R. at 667.

On April 12, 2017, Ms. Raiford presented to Dr. Gaudin with complaints of headaches. R. at 654. She had normal gait and stance. R. at 656. She was diagnosed with tension type headaches and prescribed Fioricet. R. at 656. She returned to Dr. Gaudin on June 21, 2017, complaining of headaches. R. at 650. She also reported dizziness. R. at 651. But she had no anxiety, no depression, and no sleep disturbances. Id. Her gait and stance were normal. R. at 562. Ms. Raiford followed up for refills on October 17, 2017. R. at 525. She reported metoprolol had helped with palpitations and headache. Id. She was negative for headache, chest pain, discomfort, sleep disturbances, anxiety, and depression. R. at 525-26.

On October 17, 2017, Ms. Gaudin followed up with Dr. Gaudin for refills. R. at 525. She reported no headache, no anxiety, no depression, and no sleep disturbances. R. at 526. She was prescribed Klonopin. R. at 527.

Ms. Raiford was negative for back and neck pain when she presented at the Emergency Room with complaints of chest pain on November 24, 2017. R. at 356. During that visit, she was diagnosed with a nonbleeding stomach ulcer. R. at 372, 377. She followed up with Dr. Gaudin on November 28, 2017. R. at 521. She had no neck pain or stiffness and her gait and stance were normal. R. at 523.

Ms. Raiford presented to Dr. Gaudin on February 19, 2018, and reported an episode of blacking out while driving. R. at 517. She reported no neck pain or stiffness and there was no decease in neck suppleness. R. at 518. Overall musculoskeletal findings were normal. R. at 519. She had a normal gait and stance. Id. Keppra was increased and she was ordered not to drive for six months. Id.

Ms. Raiford returned to Dr. Gaudin on September 20, 2018, reporting that she had pulled her back the day before and was experiencing right lower back pain. R. at 796. She had no neck pain or stiffness. R. at 797. She had a normal gait and stance. Id.

Ms. Raiford presented for a wellness visit on December 18, 2018. R. at 785. She had no headache, no gait instability, and no anxiety, depression, or sleep disturbances. R. at 786-87. She had normal gait and stance. R. at 788.

Ms. Raiford presented for a wellness visit on December 18, 2018. R. at 785. She had no headache, no gait instability, and no anxiety, depression, or sleep disturbances. R. at 786-87. She had normal gait and stance. R. at 788.

Ms. Raiford presented at the emergency room on January 24, 2019, complaining of a seizure one hour prior to arrival. R. at 417-18. She reported that she takes Keppra but had not done so that morning. R. at 418. She was at baseline mental status and had no other complaints. Id. On

a review of systems, however, she was positive for headaches. R. at 419. Upon physical examination, she had normal range of motion in her neck and musculoskeletal system. Id. A CT scan of the cervical spine was performed. R. at 420. Mild chronic degenerative changes similar overall were noted. R. at 421. A CT scan of the head was also performed and no intracranial changes were appreciated. R. at 421-22. Her presentation was determined to be consistent with seizure activity due to non-compliance. R. at 422. Keppra was given. Id. She was stable upon discharge, and it was noted that she ambulated without difficulty. Id.

On March 8, 2019, Ms. Raiford was seen by Nurse Practitioner Laura Read with complaints of seizures. R. at 730. She reported having seizures for the previous two and a half years, with her last seizure a month earlier. Id. She reported that her seizures last approximately 1-2 minutes. Id. Her mother reported that she is postictal for hours to days and does not completely return to baseline. Id. Her seizures occur every four to six months. Id. On a review of systems, Ms. Raiford was positive for back problems, headaches, tremor, and pain in her back, neck, and lower extremities. Id. She denied balance difficulty, difficulty speaking, loss of strength, and gait abnormality. Id. She was alert and oriented, her cognitive exam was grossly normal, she had normal strength, tone and reflexes, and her neck was supple. R. at 731. Psychiatric condition was noted to be normal. Id. She was advised not to drive or operate heavy machinery until 6 months seizure free (also to avoid bathing in a tub, swimming, and climbing to high levels). R. at 732.

An MRI of the brain was performed on March 29, 2019. R. at 740. She followed up with Nurse Read on April 8, 2019. R. at 733. Her Keppra prescription was elevated. Id. She reported no more seizure-like activity. Id. It was noted that her MRI showed no acute abnormality. Id. She was positive for headache, seizures, back, neck, lower extremity pain. R. at 734. She was negative

for gait abnormality. Id.  She was alert and oriented, and her cognitive exam was grossly normal. Id.  She had normal motor strength and her neck was supple. R. at 735.

On May 30, 2019, Ms. Raiford presented at the Advanced Brain & Spine Institute with neck and back pain following a motor vehicle accident on March 26, 2019. R. at 495. She was seen by Dr. Mohammad Almubaslat. Id. She described the neck pain as sharp/knife stabbing pain that radiates down her right arm to her hand. Id. The pain was associated with numbness/parasthesias in the right arm and all digits of the right hand. Id.  She rated her pain as 6 out of 10 and reported leaning forward as an aggravating factor. Id.  She similarly described her back pain as a sharp knife/stabbing pain, but the pain did not radiate and she had no numbness. Id. She was not prescribed anything for pain but advised to take Tylenol 500MG every 8 hours which does sometimes help with pain. Id.  She reported that following her 2015 accident, symptoms had improved significantly until the current accident that caused her symptoms to return. Id.  Her right arm was worse than in the past. Id.  On physical examination, no gross alignment of the neck was noted, but there was tenderness in the paraspinal muscles and proximal shoulder and her range of motion was limited due to pain. R. at 497. Range of motion of the lumbar spine was also limited due to pain. Id.  Motor strength of her upper and lower extremities were 5 out of 5, except for her right deltoid (4/5) and right brachiodialis (4+/5). Id.  Her right and left hand grip were 5/5. Decreased touch and pinprick sensations over the right forearm and first 4 digits of right hand were noted. Id.  Her gait and posture were normal Id.  Dr. Almubaslat noted a recurrence of neck and back pain with new symptoms of right arm weakness and numbness and pain, restriction of motion in the neck and stiffness on examination, as well as signs of right sided upper radiculopathy. Id. MRIs and dynamic x-rays were ordered and she was cleared for physical therapy. Id.

Ms. Raiford returned to Dr. Gaudin on May 21, 2019, complaining of neck pain that radiates to the lower back and right hip for six weeks, following her motor vehicle accident. R. at 774. She reported that when she picks up her grandchildren, it hurts more. Id. She had no anxiety, depression, or sleep disturbances. R. at 776. She had a normal gait and stance. R. at 777. X-rays were performed. The x-ray of her cervical spine showed acute bony abnormality of the cervical spine and mild degenerative changes and degenerative-appearing malalignment of the mid and lower cervical spine. R. at 996. No acute findings were noted on the hip x-ray. R. at 997. The x-ray of her lumbar spine showed no significant bony abnormality and void right upper quadrant calcification that might be costochondral in origin or indicative of cholelithiasis. R. at 998.

During her July 22, 2019, follow up with Nurse Read, she reported an episode of feeling shaky in June, but she did not "go completely out." R. at 736. She fell and hit her head but had no convulsions. R. at 736. It may have been dehydration. Id. It was noted that she would be cleared to drive if she remained seizure free until September 2019 (her last seizure was Feb. 2019). Id. She was positive for dizziness, back problems, back, neck lower extremity pain, and headache. R. at 736-37. She denied gait abnormality. R. at 737. Her cognitive exam was grossly normal and psychiatric was normal. R. at 738.

Ms. Raiford had a check-up with Dr. Gaudin on July 29, 2019. R. at 763. She had no headache, no anxiety, no depression, and no sleep disturbances. R. at 765. She had a normal gait and stance. R. at 766.

An MRI of the cervical spine was performed on August 5, 2019. R. at 930. The following impression was noted: cervical spinal canal is small on a congenital basis; loss of normal lordotic curve of the cervical spine is identified, associated with muscle spasm secondary to soft tissue injury; broad-based posterior disc herniation at C4-C5 extending .2cm into spinal canal causing

some compression of spinal cord; moderate degree of stenosis of right invertebral foramen; broad-based posterior disc herniation at C6-C7 extends .2 cm into the spinal canal; abnormal increased signal intensity is noted in an annular tear of the annulus fibrosis of the disc at the site of the herniation, and this can be a pain generator. R. at 931.

An MRI of the lumbar spine was also performed on August 5, 2019. R. at 935. The following was impression was noted: lumbar spinal canal is small on a congenital basis; a broad-based right posterolateral disc herniation at L1-L2 extends .35 cm into the spinal canal, causing 25% stenosis of the right subarticular zone of the spinal canal with some compression of the right L2 nerve root; abnormal increased signal sensitivity is noted in an annular tear of the annulus fibrosis of the disc at the site of the herniation, and this can be a pain generator. R. at 936.

Ms. Raiford followed up with Nurse Read to review Keppra levels on September 23, 2019. R. at 1065. The notes indicate that labs from July 22 showed levels undetected. Id.  Ms. Raiford was seeking clearance to drive. Id.  She reported that her last seizure was the previous Thursday. Id.  Seizure frequency was approximately 3 months. Id.  She reported numbness and weakness to her right upper and lower extremities. Id.  On a review of symptoms, she was positive for headaches, seizure, and back, neck, and lower extremity pain. R. at 1066. On an examination, her motor strength was normal in the upper and lower extremities and her neck was supple. R. at 1067.

On October 2, 2019, Ms. Raiford followed up with Dr. Almubaslat after the imaging. R. at 1024. Ms. Raiford was positive for numbness/tingling and limitation on motion and negative for headaches and weakness in extremities. R. at 1025. Palpation of neck revealed no crepitus or gross misalignment, but there was tenderness in the paraspinal muscles and proximal shoulder. Id. Motor strength in the upper and lower extremities, including grip strength, was the same as in May 2019. R. at 1026. Spurling's test was positive to the right and negative to the left. Id.  It was noted that

her arm symptoms correlate with the MRI findings of disc herniation and severe root impingement. Id. Lumbar symptoms were likely a mix of trauma to the sacroiliac joint as well as possible symptoms referred to right L2 radiculopathy from L1-2 disc herniation. Id. They discussed treatment options and planned to begin with physical therapy for eight weeks for cervical spine, lumbar spine, and SI joint and trochanteric bursitis. Id. If this was not adequate, they would contemplate trigger point or paravertebral injections for the cervical and lumbar spine as well as SI injections. Id.

At her November 13, 2019, appointment with Dr. Gaudin, she reported no neck pain or stiffness. R. at 1044. Her gait and stance were normal. R. at 1045.

Ms. Raiford followed up with Nurse Read on January 24, 2020, after obtaining emg/ncs and EEG and increasing Keppra to 1000mg. R. at 1069. She reported occasional numbness to her right arm, mostly above the elbow. Id. She stated that the pain starts at her right neck and radiates down to her arm; seldomly the pain will radiate all the way down to her hand. Id. She reported occasional symptoms to the left arm but not nearly as severe. R. at 1069. She reported difficulty opening things and using her right arm for activities of daily living due to pain. R. at 1070. She reported dropping things frequently. Id. Her right arm had 4/4 motor strength, with all other extremities at 5/5. Id. She was positive for headaches, seizure, and back, neck, and lower extremity pain. Id. No gait abnormality was noted. Id. She was referred to Benjamin Brown for radiculopathy. R. at 1072.

On February 5, 2020, Ms. Raiford presented to Physician Assistant Katherine Alleyne for evaluation of cervical radiculopathy. R. at 1108. She complained of midline neck pain that "extends to R>L shoulder" and lateral upper extremities with numbness and tingling bilateral to

hands and weakened grip of the right hand. Id.  She reported constant pain that waxes and wanes. Id.

She reported that lifting objects worsens her pain and that physical therapy had not provided much relief in the past. Id.  She was negative for confusion, decreased concentration, dysphoric mood, and sleep disturbance. Id. She showed strength of 5/5 in all areas tested, though it appears grip strength was not tested. R. at 1112-13. She had a normal gait. R. at 1113. It was noted that her symptoms seem related to right C5 radiculopathy, however they are mild in nature. R. at 1115.  Alleyne recommended conservative management with injections and physical therapy prior to proceeding with any type of surgical intervention. R. at 1115.

An X-ray of the cervical spine was also performed on February 5, 2020. R. at 1096. The report notes findings of moderate to marked disc space narrowing at C4-5 level where there is also 2mm retrolisthesis of C4 on C5, unchanged on flexion or extension; facet joints maintain normal articulation; mild disc space narrowing at C5-6; and bilateral foraminal stenosis at C4-5. R. at 1098.

Ms. Raiford presented for a psychological consultation with Dr. Sandra Durdin on February 10, 2020. R. at 1120. Her gait and posture were unremarkable. R. at 1120. She did not need any special assistance. Id.  Ms. Raiford reported that the floods in 2016 caused her to have anxiety and depression. R. at 1121. She has had to rebuild. Id.  She can become rageful if things are not her way or irritable if she feels she has been "backed into a corner." Id.  She is still grieving the loss of her brother. Id.  Her children, when they were teens, caused her to have anxiety. Id.  She has contact with family and friends; she prepares food, uses a phone, watches TV, and listens to music, she shops and handles money; and she does embroidery, takes care of her flowers, goes to a camp, and fishes, and loves being outside. R. at 1121. On examination, her

concentration/attention was sustained and on task. R. at 1122. Her judgment, fund of information, abstract reasoning, adaptive functioning, and estimated intellectual functioning were average. Id. Dr. Durdin concluded that Ms. Raiford's ability to understand, recall, and carry out simple instructions is not impaired with proper treatment of symptoms and her ability to handle familiar details is not impaired for routine demand. R. at 1123. Her ability to sustain attention for 2 hour blocks of time is good. Id.  Her ability to get along with others in a work setting, including co-workers and supervisors is not impaired Id.  Her ability to sustain productivity over a 40 hour work week is not impaired with treatment of symptoms. Id.  Her ability to withstand routine demands, pressure, or expectations is not impaired for routine demands of a repetitive nature. Id. It was noted that she has just had one counseling session so far. Id.

Ms. Raiford followed up with Nurse Practitioner Matthew Ladouceur on May 21, 2020, for seizures and neuropathy. R. at 1285-86. She denied any seizures since September 2019. R. at 1286.

On May 29, 2020, Ms. Raiford presented for an initial psychiatric evaluation with Dr. Victor Linden. R. at 1167. She complained of depression and anxiety and reported "a lot of emotions." Id.  She had experienced two floods of her home, she had lost her belongings twice, she had lost her job, and she started having seizures. Id.  Her depression was characterized by insomnia, rumination, disinterest, isolation, decreased concentration, and anhedonia. Id. She reported recurrent suicidal intentions and has made threats to intentionally crash her car. Id.  She endorsed frequent anxiety on most days concerning a number of different issues that it is difficult for her to control. Id.  Her anxiety was characterized by restlessness, decreased concentration, irritability, jaw clenching, and insomnia. Id.  She has had panic attacks. Id. On mental status examination, her behavior was calm and appropriate, her attitude was cooperative, appropriate,

motivated, and attentive. R. at 1169. Her speech was normal. Id.  Her mood was "ok." Id.  her affect was appropriate, congruent, constricted, and tearful when discussing suicidal intentions. Id. Her thought processes were coherent and goal-directed. Id.  Her memory and concentration were intact to conversation. R. at 1170. Her judgment was unimpaired and her insight was appropriate. Id.  She was assessed with manic depressive disorder, moderate, recurrent; general anxiety disorder; and seizure disorder. R. at 1173. The plan was to cross-titrate from Lexapro to Cymbalta, she expressed a clear choice to begin/continue medication. Id.

Ms. Raiford followed up with Dr. Linden on June 23, 2020, and reported improved mood since her last appointment. R. at 1175. She noted that she was not as "foggy" and that her "brain isn't as jumbled." Id.  She reported less irritability and better sleep. Id.  She has not needed to take Klonopin since starting Cymbalta. Id. Her attitude was cooperative, appropriate, motivated, and attentive; her speech was normal. R. at 1177. Her mood was euthymic, her affect was appropriate and congruent. Id. Her thought processes/form was coherent and goal-directed. Her concentration and memory were intact to conversation. Id.  Her judgment was unimpaired and her insight was appropriate. Id.  She expressed a clear choice to continue medication. Id.

Ms. Raiford returned to see Dr. Gaudin on July 9, 2020, for refills. R. at 1189. She was not feeling poorly and had no headache, no neck pain, and no neck stiffness. R. at 1190. She was negative for vision problems. R. at1191. She reported no anxiety, no depression, and no sleep disturbances. Id.  Her gait and stance were normal. R. at 1192. She was prescribed Clonazepam for insomnia. Id.

Ms. Raiford presented at the emergency room on August 11, 2020, after vomiting and an altercation with her boyfriend that resulted in him kicking her in the back and causing her to fall down four stairs. R. at 1305. She reported pain to posterior neck and lower back. Id.  She was

ambulatory without difficulty. Id.  On physical examination normal range of motion with spinous process tenderness present was noted. R. at 1307.  In her right hand, she had normal range of motion, no tenderness, and normal two-point discrimination. R. at 1308. She had normal sensation and strength of 5/5 in bilateral lower extremities. Id.  She walked with a steady gait. Id.  Her mood, behavior, thought content, and judgment were normal. R. at 1308. An x-ray of cervical spine revealed moderate degenerative disc disease at C4-5 and C5-6. R. at 1309. There were no acute findings of lumbar spine x-ray. R. at 1309.

Ms. Raiford followed up with Dr. Linden on September 8, 2020. R. at 1333. She reported that her mood had worsened; her boyfriend broke up with her and kicked her out of the house. Id.  Her behavior was calm and appropriate. R. at 1334. Her attitude was cooperative, appropriate, and apathetic. R. at 1335. Her speech was normal. Id.  Her mood was sad, and her affect was full range, tearful at times. Id.  She did not want to hurt herself. Id.  Her concentration and memory were intact to conversation, her judgment was unimpaired, and her insight was appropriate. Id.

On September 21, 2020, Ms. Raiford presented to Dr. Emily Powell at New Med Plus Hammond LA Healing Health Center for a consultative examination. R. at 1013. Ms. Raiford reported that her mental condition affects her ability to work because she is avoidant of social situations. R. at 1014. She reported that she uses a walker, is able to walk very short distances on level ground, is able to feed herself but needs help sometimes, and is able to dress herself but needs help sometimes. Id.  She reported difficulty standing. Id.  She said she was able to sweep, mop, vacuum, prepare meals, and do dishes for only 0-5 minutes at a time. Id.  She reported she was not able to shop for groceries. Id.  She said she could not climb more than 2 or 3 steps. Id.  She reported no difficulty turning a doorknob. Id

Upon examination, Ms. Raiford had a normal gait and ambulated without difficulty and without an assistive device. R. at 1015. She was able to get in and out of the chair and on and off the examination table without difficulty. Id. On the Snellen eye chart, her right eye was 20/50 and her left eye was 20/200. Id. Her vision was noted to be grossly abnormal. R. at 1015. During the sitting straight leg raising test, each leg was 70 degrees and negative with pain R. at 1016. During the supine straight leg raising test, each leg was 60 degrees and negative with pain. Id. She was able to walk on toes and heels but unable to squat. Id When grip strength was tested, she had difficulty with grip in her right hand, 4+/5. R. at 1017. A score of 4+ is defined as active movement against strong resistance but not the expected full power (taking degree of fitness and age into account). R. at 1016. She had normal fine and gross manipulative skills in her right hand. R. at 1017. Her motor strength was 5/5 in all extremities. Id. Her sensation was abnormal; she had tingling and numbness of the right arm. Id. Range of motion was not full in all extremities. Id. Crepitus and pain were noted for her hip. Id. Joint abnormality and pain were noted for cervical spine. Id. Lumbar spine was within normal limits. Id. Dr. Powell concluded that based on available medical history and objective clinical findings, Ms. Raiford had no limitations on ability to stand, sit, walk, bend or stoop, reach, handle, lift, carry, see, hear, or with memory or understanding. R. at 1018.

Ms. Raiford treated with Dr. John Gomez via Facetime on October 8, 2020. R. at 1288. She reported no recent seizures. R. at 1291. She reported continued pain, numbness, and tingling from her neck going down her right arm. Id. She said that driving and picking up heavy things can trigger it. Id. She reported that Cymbalta had helped tremendously. Id. Cymbalta was increased and she was sent to physical therapy. Id.

Ms. Raiford presented to with Dr. Linden on November 6, 2020. R. at 1343. Her mother reported that Ms. Raiford had been acting erratic and making threats to harm herself as well as her mother and father. Id. Ms. Raiford was tearful and irritable. Id. Her behavior was calm and cooperative, but her attitude was defiant towards her mother. R. at 1344-45. Dr. Linden issued a physician's emergency certificate for danger to self. R. at 1348.

That same day, Ms. Raiford was admitted to the Oceans Behavioral Hospital of Hammond, where she remained until discharge on November 11, 2020. R. at 1165. It was noted that she had made suicidal threats and cut her wrist superficially. Id. Cymbalta and Klonopin were continued, Abilify and trazodone were started. Id. Stable for discharge back home on November 11. Id. Her prognosis was fair with medication compliance and follow up. Id.

Ms. Raiford followed up with Dr. Gomez on January 28, 2021. R. at 1293. Cymbalta was continued and physical therapy was reordered. Id. Her last known seizure was still September 2019. R. at 1296. She reported that the higher Cymbalta dose had helped with neck and arm pain, but it still bothers her once in a while. R. at 1296.

### Decision of the Administrative Law Judge

Of relevance to the present appeal, the ALJ determined that Ms. Raiford has the following "severe" impairments: cervical spine herniations at C4-5 and C6-7 with C6 radiculopathy, lumbar spine herniation at L1-2, seizure disorder, neuropathy, migraine headaches, essential hypertension, depression, anxiety, and panic disorder. However, the ALJ determined that Ms. Raiford does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ next found that Ms. Raiford has the residual functional capacity ("RFC") to perform light work as defined by the regulations, with standing and/or walking for a total of six

hours in an eight-hour workday, and sitting for six hours in an eight-hour workday, except she can occasionally balance, stoop, kneel, crouch, and crawl; she can never climb ramps, stairs, ladders, ropes, and scaffolds, she can reach overhead occasionally and reach in all other directions frequently; she must avoid moderate exposure (no more than occasional) to vibrations; and she can have no exposure to hazards (dangerous moving machinery, unprotected heights, operating motor vehicles, and open bodies of water). Further, she can perform simple, routine, repetitive tasks of unskilled work, is able to maintain attention and concentration for no longer than two-hour blocks of time; and requires a low-stress work environment (no fast-paced production requirements and only simple work-related decisions with few or no changes in the work setting). The ALJ found Ms. Raiford was unable to perform any of her past relevant work. However, considering her age, education, work experience, and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Ms. Raiford can perform. Accordingly, the ALJ concluded that Ms. Raiford has not been under a disability as defined by the Act from September 13, 2016, through the date of his decision on June 30, 2021.

### Statement of Issues on Appeal

Issue No. 1.    Did the Commissioner apply the correct legal standard when assessing Ms. Raiford's RFC and is the RFC determination supported by substantial evidence?

Issue No. 2.    Did the Commissioner evaluate Ms. Raiford's symptoms under the proper legal standard?

### Analysis

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.

Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005).  Substantial evidence is more than "a mere scintilla," but less than a preponderance.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)).  This Court may not re-weigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.   Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not

disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work in the national economy." Id. Once the Commissioner has made this showing, the claimant bears the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity is used in steps four and five to determine the claimant's ability to perform his past work or any other type of work. Id.

### III.   **Plaintiff's Appeal**.

*Issue No. 1.    Did the Commissioner apply the correct legal standard when assessing Ms. Raiford's RFC and is the RFC determination supported by substantial evidence?*

Ms. Raiford argues that the Commissioner erred in failing to include limitations for two impairments that the ALJ found to be severe. Specifically, she points out that the ALJ found that her neuropathy and radiculopathy were severe. As a result, she argues that the ALJ should have included manipulative limitations for her complaints of dropping things with her right hand. She adds that the ALJ found her headaches are a severe impairment. She argues that the ALJ failed to include any limitations due to the headaches.

Ms. Raiford submits that the ALJ stopped the analysis at step 1 and failed to evaluate the intensity and persistence of symptoms and the resulting manipulative limitations due to radiculopathy. She argues that substantial evidence does not support the ALJ's finding that she has

no limitations in handling and fingering given that she complained to her doctors that she was dropping things, that numbness and tingling extended to both hands with weakened grip in her right hand, and that lifting objects caused her pain to worsen. She also points to the EMG that demonstrated right C6 radiculopathy. She argues that these clinical complaints correlate with the objective findings in the MRI of the cervical spine and EMG/NCS. She argues further that her testimony at the hearing that she drops objects and cannot hold onto things with her dominant right arm and hand is consistent with the medical records. She argues further that her treatment with prescription medications for pain also supports the presence of a medically determinable impairment. She argues that the ALJ failed to discuss or evaluate her complaints of manipulative limitations. She points out that the light jobs identified by the vocational expert require frequent handling and fingering.

Ms. Raiford insists that remand is appropriate here because the ALJ failed to apply the proper standard in evaluating the evidence when the ALJ failed to evaluate manipulative limitations in assessing her RFC. She argues that this Court cannot rectify the ALJ's failure by weighing the evidence regarding manipulative limitations.

The Commissioner argues that the ALJ properly provided a narrative discussion of the evidence and based Ms. Raiford's RFC on relevant evidence. The Commissioner points out that the ALJ considered the normal neurological examination in January 2019 where Ms. Raiford was described as ambulating without difficulty. The Commissioner adds that following Ms. Raiford's March 2019 car accident, Dr. Almubaslat's examination showed normal gait and muscle tone in Ms. Raiford's extremities, including normal grip strength, but 4/5 strength in the right deltoid (the round muscle around the top of the upper arm and shoulder) and 4+/5 strength in the right brachioradialis (forearm muscle). The Commissioner argues that this evidence is consistent with a

light RFC with occasional overhead reaching and frequent, instead of constant, reaching in all other directions.

The Commissioner points out that the ALJ considered Dr. Powell's 2019 consultative examination, which showed a normal gait, normal motor strength in all extremities, normal range of motion in the wrist and both hands, and normal fine and gross manipulative skills in both hands, despite 4+/5 grip strength in the right hand. Dr. Powell also noted that Ms. Raiford had no difficulty in turning a doorknob. Dr. Powell also opined that Ms. Raiford had no limitations in handling. Thus, the Commissioner argues that the ALJ properly declined to include additional manipulative limitations in the RFC assessment.

The Commissioner further directs the Court to the ALJ's consideration of PA Alleyne's treatment notes in February 2020. Ms. Raiford alleged numbness and tingling in both hands with weakened grip in the right hand and that lifting objects worsened the pain. As the Commissioner points out, in considering these notes, the ALJ emphasized that Alleyne determined Ms. Raiford's radiculopathy was mild in nature and there was no weakness on examination. Indeed, Alleyne's examination showed normal muscle tone and motor strength "throughout" including Ms. Raiford's neck, arms, and wrists. The Commissioner insists that the ALJ properly excluded additional manipulative limitations in Ms. Raiford's RFC.

The Commissioner adds that state agency medical consultant Dr. Hargus reviewed the evidence available through September 2020 and found that Ms. Raiford had a light RFC with postural and environmental limitations, but no manipulative limitations. The Commissioner argues that this contradicts Ms. Raiford's claim of disabling limitations and supports the ALJ not including handling and fingering limitations in the RFC assessment.

As to headaches, the Commissioner notes that a claimant must only make a de minimis showing to establish that an impairment is severe and advance beyond step two. Henderson v. Saul, No. CV 20-02045, 2021 WL 3508495, at *12 (E.D. La. July 13, 2021), report and recommendation adopted, No. CV 20-2045, 2021 WL 3362933 (E.D. La. Aug. 3, 2021). The Commissioner adds that Ms. Raiford's January 2019 head CT scan was described as within normal limits and that a March 2019 brain MRI showed no acute intracranial abnormality. Moreover, the Commissioner notes that Ms. Raiford did not even allege migraine headaches as a disabling condition in her June 2019 application for benefits. Further, the Commissioner points out that the ALJ considered Dr. Almubaslat's October 2019 treatment note showing that Ms. Raiford denied experiencing headaches.

Nonetheless, the ALJ argues that the Commissioner accounted for migraine headaches by incorporating limitations to simple, routine, repetitive tasks of unskilled work; to maintaining attention and concentration for no longer than 2-hour blocks of time; and to a low stress work environment. The Commissioner points out that SSR 19-4p underscores that "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." The Commissioner argues that although Ms. Raiford alleges that her migraines would cause her to be off task or need to lie down, she does not identify any objective medical evidence during the relevant period that supports these allegations. Therefore, the Commissioner argues that Ms. Raiford has failed to establish an error in the RFC assessment that requires remand.

The Court agrees with the Commissioner's argument. The ALJ's RFC assessment is supported by substantial evidence, and the ALJ did not err in failing to include additional functional limitations. Although the ALJ did not include manipulative limitations, the ALJ did include limitations to account for Ms. Raiford's radiculopathy and neuropathy. As the

Commissioner points out, this includes reaching limitations. Of note, a limitation to light work includes a limitation to "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Dr. Almubaslat determined that Ms. Raiford had normal grip strength in May and October 2019. R. at 497, 1026. And as the Commissioner points out, although weakened grip was noted in PA Alleyne's notes in February 2020, Alleyne also found Ms. Raiford's symptoms were mild and recommended conservative management with injections and physical therapy. R. at 1108, 1115. And although the consultative examiner Dr. Powell determined Ms. Raiford had grip strength of 4+/5, she concluded that Ms. Raiford needed no handling limitations. R. at 1017-18. Indeed, Dr. Powell also found Ms. Raiford had normal fine and gross manipulative skills in her right hand. R. at 1017. Ms. Raiford reported to Dr. Powell that she had no difficulty turning a doorknob. R. at 1014. The ALJ was tasked with weighing the evidence, and substantial evidence supports the ALJ's decision not to include manipulative limitations in the RFC.

Further, the Court finds that the ALJ did not fail to apply the correct legal standard. Ms. Raiford argues that the Court must reverse the ALJ's decision because the ALJ failed to evaluate or consider manipulative considerations. First, the Court notes that the case law cited by Ms. Raiford for this argument does not support it. It is true that "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." Loza v. Apfel, 219 F.3d 378, 393 (5th Cir. 2000). But in the Loza case, the court of appeals found the ALJ's decision that the claimant's mental impairment was not severe was not supported by substantial evidence because the ALJ had not considered whether the combined effects of all impairments would be of sufficient severity. Nor did the ALJ consider the VA's determination that the claimant had a service connected 100% disability from 1979-1980, a 1974 determination by his doctor that

he could not return to full employment, or the consistent diagnosis and treatment of his mental impairment as organic brain syndrome, chronic brain syndrome, or post-traumatic stress disorder by several treating physicians from 1974 through the date of the hearing before the ALJ. Nor did the ALJ consider the VA treating physician's regular prescription of a powerful antipsychotic and antidepressants beginning in 1974 and through the date of the hearing, and overwhelming evidence of the claimant's inability to maintain social interactions. Id. at 394. The present case is simply not comparable. The ALJ's summary of the evidence shows that the ALJ considered Ms. Raiford's testimony that she drops things every day and her 4+/5 grip strength with Dr. Powell along with her complaints of numbness and tingling in her right arm. R. at 20-21. Ms. Raiford does not point to a list of evidence that the ALJ failed to consider as in Loza. Here, the ALJ reasonably excluded manipulative limitations and the ALJ's failure to explicitly state that manipulative limitations were being rejected is not an error considering the evidence of record supporting the RFC.

Ms. Raiford also cites Kneeland v. Berryhill, 850 F.3d 749, 759 (5th Cir. 2017), in support of remand for failure to evaluate manipulative limitations. But there, the Fifth Circuit found the ALJ erred in failing to consider a treating physician's medical opinion as required by the regulations. Id. There is no similar issue present in this case.

Ms. Raiford's Issue 1 argument as to headaches is that the ALJ erred in finding headaches severe but not including limitations due to headaches. In this section of her argument, she does not say what limitations should have been included. She does not cite any complaints or medical findings to support additional limitations. During the relevant period, Ms. Raiford was positive for headaches in March 2019, July 2019, September 2019 and January 2020. R. at 734, 736-37, 1066, 1070. She had no headaches at a different July 2019 appointment and at appointments in October 2019 and July 2020.  R. at 765, 1025, 1190. As the Commissioner points out, Ms. Raiford did not

even allege migraines as an impairment in her application for benefits. She did not mention headaches in the hearing before the ALJ. Further, as the Commissioner notes, the ALJ incorporated limitations to simple, routine, repetitive tasks of unskilled work; to maintaining attention and concentration for no longer than 2-hour blocks of time; and to a low stress work environment. These limitations account for any difficulty with mental tasks that Ms. Raiford might have due to her migraines—though Ms. Raiford has not identified any medical evidence or even subjective reports to support such symptoms. The ALJ's failure to include any additional limitations for migraine symptoms is supported by substantial evidence.

For the foregoing reasons, the Court finds that the Commissioner applied the correct legal standard when assessing Ms. Raiford's RFC and that the RFC determination is supported by substantial evidence.

*Issue No. 2.      Did the Commissioner evaluate Ms. Raiford's symptoms under the proper legal standard?*

Ms. Raiford argues that Social Security Rulings 96-8p and 16-3p require that all medically determinable impairments found to be severe must result in functional limitations in an RFC. She argues that the ALJ erred in failing to mention her headaches after step 2, despite finding migraine headaches were a severe impairment. Ms. Raiford further argues that the ALJ erred in failing to evaluate the intensity and persistence of her symptoms of chronic pain, headaches, reduced grip strength in her right hand, decreased touch and pinprick sensations in her right hand, and positive Spurling's test in her right hand. She points out that Dr. Almubaslat found a clinical correlation between her complaints and the MRI findings. She adds that the ALJ discussed the medical evidence that she had a 4+/5 grip strength in the right hand and complaints of tingling and numbness. The ALJ also noted clinical findings of decreased touch and pinprick sensations,

positive Spurling's test, and reduced motor strength.   And she notes that she testified that she has to lie down due to chronic pain resulting from her impairments, including migraines. Yet she says the ALJ failed to discuss her migraine headaches or manipulative limitations resulting from radiculopathy and neuropathy within the RFC analysis.

Ms. Raiford submits that the vocational expert's testimony cannot be relied upon because the RFC is deficient. She adds that the vocational expert testified that an individual could not sustain employment if she was required to take a ten minute break every hour.  She argues that had the ALJ evaluated the migraine headaches properly, he would reasonably have found that they would cause her to be off task or need to lay down for ten minutes every hour, and she could have been found disabled. She further argues that had the ALJ properly considered manipulative limitations, this could have reduced her to a sedentary RFC. This classification would have resulted in a finding of disability under the Medical-Vocational Guidelines Rule 201.06.

Ms. Raiford also argues that Social Security Ruling 19-4p requires that in considering primary headache disorder in assessing a person's RFC, the ALJ must consider and discuss the limiting effects of all impairments and any related symptoms. She points out that Social Security Ruling 19-4p lists "difficulty sustaining attention and concentration" as an example symptom of a primary headache disorder such as photophobia. She argues the ALJ failed to follow the requirements of the rulings and regulations.

The Commissioner argues that the ALJ properly concluded that Ms. Raiford's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence. The Commissioner notes that the ALJ may discount a claimant's subjective complaints if they are inconsistent with the evidence as a whole. Here, the Commissioner points out, the ALJ considered Ms. Raiford's statement that she drops objects

several times a day, but the ALJ also emphasized examinations that showed a normal grip strength. For example, the ALJ considered Dr. Almubaslat's October 2019 and PA Alleyne's February 2020 examinations, which showed normal gait and muscle tone in Ms. Raiford's extremities. Both recommended only conservative treatment (injections and physical therapy). Further, the Commissioner points out that the ALJ noted that Ms. Raiford reported to Dr. Durdin in February 2020 that she "embroidered," went fishing, prepared food, and cared for flowers. The Commissioner argues these reports are inconsistent with her allegations regarding fingering and handling limitations. The Commissioner insists that the ALJ's subjective symptom evaluation complies with the relevant legal standards including SSR 16-3p and that substantial evidence supports his symptom evaluation.

The Court agrees with the Commissioner's argument that the ALJ properly evaluated Ms. Raiford's symptoms. Ms. Raiford argues that Social Security Rulings 96-8p and 16-3p require that all medically determinable impairments found to be severe must result in functional limitations in an RFC. It is not clear that these rulings impose a requirement like the one proposed by Ms. Raiford. SSR 96-8p requires the ALJ to "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Where symptoms such as pain are alleged, the ALJ must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." Id. SSR 16-3p sets forth the two-step evaluation: First the Commissioner considers whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to cause the person's symptoms. Soc. Sec. Ruling 16-3p Titles II & XVIi: Evaluation of Symptoms in

Disability Claims, SSR 16-3P (S.S.A. Oct. 25, 2017). If so, the Commissioner then evaluates the intensity and persistence of those symptoms. Id.

Ms. Raiford argues that the ALJ erred in failing to discuss manipulative limitations in his RFC analysis. As discussed above, the Court has found that the ALJ's RFC determination with regard to Ms. Raiford's radiculopathy and neuropathy is supported by substantial evidence. The ALJ considered the evidence that Ms. Raiford now cites and the ALJ explained his reasoning. The ALJ incorporated limitations to account for her radiculopathy and neuropathy. Given the minimal evidence of handling/fingering limitations, the ALJ did not err in failing to explicitly state why such limitations were not included.

Ms. Raiford argues that the ALJ should have considered her testimony that she needs to lie down because of chronic pain resulting from her impairments including migraines. She says that had the ALJ properly evaluated her migraines, he would have determined that they would cause her to be off-task or need to lie down. First, the Court notes that Ms. Raiford did not testify that her migraines required that she lay down during the day. She testified that her back pain would cause her to lie down. [3] She points to no evidence or subjective complaints supporting a finding that she would be off task or need to lie own because of her migraines. As discussed above, there is minimal headache related evidence.

Ms. Raiford argues that the ALJ failed to comply with Social Security Ruling 19-4p, which provides that:

> If a person's primary headache disorder, alone or in combination with another impairment(s), does not medically equal a listing at step three of the sequential

---

[3] Ms. Raiford has not argued that the ALJ failed to properly evaluate her back pain, and she has therefore waived any such argument. Ms. Raiford refers to "chronic pain" in her statement of the issue, but she does not cite to any medical evidence to support any argument that the ALJ failed to properly assess her complaints of pain. The only testimony she cites is her testimony regarding her need to lay down. She focuses her argument on manipulative limitations and the need to lie down to take breaks, which the court addresses in this section. To the extent Ms. Raiford intends to challenge the ALJ's evaluation of her complaints of pain, the court finds no basis to conclude that the ALJ improperly evaluated Ms. Raiford's pain.

evaluation process, we assess the person's residual functional capacity (RFC). We must consider and discuss the limiting effects of all impairments and any related symptoms when assessing a person's RFC.

Soc. Sec. Ruling, Ssr 19-4p; Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders, SSR 19-4P (S.S.A. Aug. 26, 2019). She notes that SSR 19-4p lists "difficulty sustaining attention and concentration" as an example symptom. Id. Importantly though, the example is of a "symptom of a primary headache disorder, such as photophobia." Id. No medical record or testimony appears to support finding that Ms. Raiford suffered from such symptoms. SSR 19-4p also provides that "[c]onsistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC." Id. There is simply no basis to find a correlation between the symptoms she now advances and her migraines. In any event, as discussed above, the RFC includes limitations to simple, routine, repetitive tasks of unskilled work; to maintaining attention and concentration for no longer than 2-hour blocks of time; and to a low stress work environment. These would account for difficulty sustaining attention and concentration.

As the Commissioner points out, the ALJ is in the best position to assess a claimant's subjective symptoms because "[t]he ALJ enjoys the benefit of perceiving first-hand the claimant at the hearing." Falco v. Shalala, 27 F.3d 160, 164 n. 18 (5th Cir. 1994). The Court finds that the Commissioner evaluated Ms. Raiford symptoms under the proper legal standard.

## RECOMMENDATION

For the foregoing reasons, the Court finds that the Commissioner applied the correct legal standard when assessing Ms. Raiford's RFC, that the RFC determination is supported by substantial evidence, and that the Commissioner evaluated Ms. Raiford symptoms under the proper legal standard. Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 7) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 9) be GRANTED.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 9th day of January, 2023.

Janis van Meerveld
United States Magistrate Judge